**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ANTONIO C.,

    **Plaintiff,**

**v.**

ANDREW SAUL, *Commissioner,
Social Security Administration,*[1]

    **Defendant.**

CIVIL ACTION FILE

NO. 1:19-cv-04694-AJB

## ORDER AND OPINION[2]

Plaintiff Antonio C. brought this action pursuant to §§ 202(d) and 1631(c)

of the Social Security Act, 42 U.S.C. §§ 402(d) and 1383(c)(3), to obtain judicial

review of the final decision of the Commissioner of the Social Security

---

[1]    On June 17, 2019, Andrew Saul was sworn in as the Commissioner of the Social Security Administration. Under the Federal Rules of Civil Procedure, Saul "is automatically substituted as a party." Fed. R. Civ. P. 25(d). The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 1/13/2020). Therefore, this Order constitutes a final Order of the Court.

Administration ("the Commissioner") denying his application for children's social security disability insurance benefits based on the record of a deceased number holder ("CDB-R") and supplemental security income benefits ("SSI") under the Social Security Act.[3]  For the reasons set forth below, the Court **AFFIRMS** the final decision of the Commissioner.

―――――――――――――

[3]      Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., provides for SSI benefits for the disabled.  Title II of the Social Security Act provides for federal Disability Insurance Benefits ("DIB").  42 U.S.C. § 401 et seq.  Title II also provides for CDB benefits.  42 U.S.C. § 402(d)(1).  In order to qualify for CDB benefits, a claimant must (1) file an application, (2) be dependent on an insured parent who is entitled to old-age or disability benefits or has died, (3) be unmarried, and (4) at the time of filing be under the age of eighteen, be a full-time primary- or secondary-school student under the age of nineteen, or be age nineteen or older and have a disability that began before the claimant turned twenty-two years old.  42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350(a).

Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  The Commissioner also evaluates a CDB claim under the same standards and definition of disability, except that the claimant must show that his or her disability began before age twenty-two.  42 U.S.C. §§ 402(d)(1), 423(d).  Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, SSI, or CDB benefits, although different statutes and regulations apply to each type of claim.  Therefore, regardless of whether the Court cites to cases, statutes, or regulations pertaining to DIB, SSI, or CDB claims, they are equally applicable to Plaintiff's SSI and CDB-R claims.

## I.   <u>PROCEDURAL HISTORY</u>

Plaintiff's applications for benefits allege disability commencing in December 2016 upon his eighteenth birthday.  [Record (hereinafter "R") 241-48]. Plaintiff's applications were denied initially and on reconsideration. [R101-27, 132-35].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").   [R136-37].   An evidentiary hearing was held on August 28, 2018, [R44-79], and a supplemental hearing to take Plaintiff's mother's testimony was held on October 3, 2018, [R80-99].  The ALJ issued a decision on January 2, 2019, denying Plaintiff's application on the ground that he had not been under a "disability" at any time from the alleged onset date through the date of the decision.   [R7-38].   Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on September 4, 2019, making the ALJ's decision the final decision of the Commissioner.  [R1-6].

Plaintiff then filed his action in this Court on October 21, 2019, seeking review of the Commissioner's decision.  [Doc. 1].  The answer and transcript were filed on March 2, 2020.  [Docs. 8, 9].  On May 4, 2020, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 15]; on May 28, 2020, the Commissioner filed a response in support of the decision, [Doc. 19]; and on June 11, 2020, Plaintiff filed a brief in support of his petition for

review of the Commissioner's decision, [Doc. 20].  The matter is now before the

Court upon the administrative record, the parties' pleadings, and the parties' briefs,[4]

and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 402(d) and 1383(c)(3).

## II.   __STANDARD FOR DETERMINING DISABILITY__

An individual is considered disabled for purposes of disability benefits if he

is unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment

or impairments must result from anatomical, psychological, or physiological

abnormalities which are demonstrable by medically accepted clinical or laboratory

diagnostic techniques and must be of such severity that the claimant is not only

unable to do previous work but cannot, considering age, education, and work

experience, engage in any other kind of substantial gainful work that exists in the

national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between

the claimant and the Commissioner.  The claimant bears the primary burden of

---

[4]        Neither party requested oral argument.  (*See* Dkt.).

establishing the existence of a "disability" and therefore entitlement to disability benefits.   20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.   20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[5] *on other grounds as stated in Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).   The claimant must prove at step one that he is not undertaking substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   At step two, the claimant must

_____

[5]      Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.   *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330,   338-39   (S.D.N.Y.   2001);   *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).   Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.   *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.    20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.   20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).   At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity ("RFC"), age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).   The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

IV.   **STATEMENT OF FACTS**[6]

   **A.  Background**

   Plaintiff was exposed to cocaine while in utero and was adopted after being

removed from the home of his biological parents because of their drug use.[7]

[R358-59].   Plaintiff applied for SSI and for CDB-R benefits on his deceased

father's work record after his survivor's benefits ran out on his eighteenth birthday.

[R10].   He has a ninth-grade education and no past relevant work.   [R75, 279].   He

alleges disability due to autism spectrum disorder[8] and social pragmatic disorder.[9]

[R50, 278].

───────────────────

   [6]   In general, the records referenced in this section are limited to those
deemed by the parties to be relevant to this appeal.   [*See* Docs. 15, 19, 20; *see also*
Doc. 10 (Sched. Ord.) at 4 ("The issues before the Court are limited to the issues
properly raised in the briefs.")].

   [7]   Throughout this Order, the Court will refer to Plaintiff's biological
parents as such and will refer to his adoptive parents simply as his mother and father.

   [8]   Autism spectrum disorder, also known as pervasive developmental
disorder, is a neurological and developmental disorder that begins in early
childhood and lasts throughout a person's life.   It affects how a person acts and
interacts with others, communicates, and learns, and people who have it can have
a   range   of   symptoms.   MedlinePlus,   *Autism   Spectrum   Disorder*,
https://medlineplus.gov/autismspectrumdisorder.html (last visited 3/232021).

   [9]   According to the fifth edition of the *Diagnostic and Statistical Manual
of Mental Disorders* ("DSM-5"), social, or "pragmatic," communication disorder
is "characterized by a persistent difficulty with verbal and nonverbal
communication that cannot be explained by low cognitive ability." Am. Psych.
Ass'n,   *Soc.   (Pragmatic)   Commc'n   Disorder*,   *available   at*

### B.   Lay Testimony

### 1.   Plaintiff's Testimony

During the administrative hearing taking place on August 28, 2018, Plaintiff testified that he had been an "average" student and had an IEP[10] program for language arts and math so that he could get extra help, since there were thirty or forty kids in his classroom.  [R55-56].  He stated that in the tenth grade, his mother took him out of public school to attend a program in Warm Springs, Georgia, where he could receive more individualized attention.  [R56, 65-66].  He reported that before he left for Warm Springs, he was struggling in math but was passing language arts.  [R55-56].  He testified that the direct help he received as part of the program at Warm Springs helped him improve his math skills and his living skills. [R57].

_____

https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Social-Communication-Disorder.pdf (last visited 3/23/2021).  Symptoms include difficulty acquiring and using spoken and written language and problems with inappropriate responses in conversation.  *Id*.  "The disorder limits effective communication, social relationships, academic achievement, or occupational performance."  *Id*.

[10]     An Individualized Educational Plan ("IEP") is a plan developed to ensure that a disabled child receives specialized instruction and related services. Documentation of measurable growth is required.  DO-IT, *What is the Difference between an IEP and a 504 Plan?*, https://www.washington.edu/doit/what-difference-between-iep-and-504-plan (last visited 3/23/2021).

Plaintiff also indicated that the school gave the students jobs. [R57]. He was assigned to work with an auto mechanic at a repair shop, doing things like changing tires, helping with oil changes, and raising cars up on racks. [R68]. He initially worked from 1:00 p.m. to 4:00 p.m., and his shift was later changed to 8:00 a.m. to 2:00 p.m. [R68]. He never received feedback on his work but did receive a certificate of completion. [R68-69, 73]. He testified that he received help in maintaining his work and that when the program had him work on his own, he "did pretty much way better than [he] probably would have in high school." [R57].

After being discharged from the Warm Springs program, Plaintiff independently got a job at Value Village, a thrift store. [R58]. He denied having any difficulties with co-workers but stated he had difficulty with one supervisor: he said that people would tell him, "you just got to understand where she's from," but he "didn't understand that one." [R59]. He also had trouble synthesizing instructions when they came from multiple people. [R59]. He stated that at times the work was "pretty easy" but that sometimes he had a lot going on and would need somebody to come over to help, and he generally had difficulty keeping up with the tasks involved. [R58-60]. After about a month and a half, he was fired. [R58, 74]. According to Plaintiff, his inability to maintain the production pace and meet his quota "was pretty much the only reason." [R62-63, 73-74].

11

Under questioning by the ALJ, Plaintiff stated that his illnesses, injuries, or conditions do not give him "too much of a problem" and that he does not have problems getting along with people he knows.  [R70-71].  He testified that while he generally stays to himself, he has a small group of friends, and he does not have any problems interacting with them or his family.  [R60-61].  Plaintiff also reported that he was able to use his phone, passed his driver's test, and was working toward a GED.  [R61, 66, 71-72].

### 2.    Plaintiff's Mother's Testimony

During the supplemental hearing taking place before the ALJ, Plaintiff's mother testified that Plaintiff had difficulty interpreting social cues correctly. [R86].  She stated, "He will perceive from his own perspective, but it's usually not the way other people perceive, so his response is to not engage."  [R86].  She also indicated that Plaintiff would "minimize the fact of whatever it is that's being asked as if he didn't get enough information or he wasn't sure what was being asked of him[, . . .] and then w[ould] isolate himself" and would "walk away while you're talking."  [R86].

Plaintiff's mother also reported that Plaintiff has difficulty initiating social interactions and responding appropriately in situations.  [R86].  As an example, she

12

noted that when Plaintiff found his father dead unexpectedly, he "had no response at all." [R86].

She additionally related that Plaintiff's "ability to interpret an emergency situation is very unlikely to be appropriate," an example of which was the previous night, when she had thrown her back out, was crying, and needed his help to get out of bed. [R86]. As soon as this was accomplished, he left her, went to get something to eat, and went upstairs, and he never came back to check on her or told his brother about it. [R86-87]. She explained, "He is not being careless or incompassionate, he just does not perceive the emergency of what I was going through." [R87]. Another example was when Plaintiff had a friend over to visit and the friend started to beat up his brother, Plaintiff did not perceive a problem despite being very close with his brother. [R87]. Plaintiff's mother stated that afterward, she disciplined Plaintiff, but he could not connect the discipline to the incident. [R87]. She stated that Plaintiff simply expresses no emotion. [R87].

Plaintiff's mother testified that Plaintiff does not understand his social role, so he completely withdraws. [R88]. He does not take social cues and cannot perceive dangers. [R88]. She stated that he has friends that he has had for years but that he does not initiate relationships or conversations: "He will reply with a

13

hello, but he will quickly disassociate and remove himself from any situation that involves someone." [R89].

Plaintiff's mother testified that the purpose of sending Plaintiff to Warm Springs was to teach him independent living skills, help him to understand his diagnosis and how to live with it, and give him vocational exposure and training. [R89-90]. She indicated that after Plaintiff completed the Warm Springs program, Georgia Vocational was supposed to follow up and assign Plaintiff a job coach, but that never happened. [R90]. She said that she believed he needs support because he needs special accommodation, frequent reminders, prompts, and extended time, but he cannot communicate his diagnosis. [R90-91]. She stated that without support, he will not be able to perceive what people are asking of him, since he does not ask questions and instead isolates himself and minimizes his diagnosis. [R91]. She noted that Plaintiff had gotten the job at Value Village on his own initiative after his brother said that he needed to go to work but that Plaintiff did not tell them about his disability and was fired for not being productive, meeting goals, or knowing how to complete assignments successfully. [R89].

## C.   Administrative Records

In a third-party function report dated February 7, 2017, Plaintiff's mother stated that Plaintiff was living at the Roosevelt Warm Springs Vocational

14

Rehabilitation dorm and that he lived with her one weekend per month while he was in school.  [R267].  She reported that he made simple meals for himself, cleaned his room and bathroom, did his own laundry, and mowed the lawn but that he would often rush through tasks, frequently failed to complete tasks, and required direction with all other household chores or special tasks.  [R269].  She indicated that Plaintiff had just gotten a learner's permit and was scheduled to begin driving lessons in a few weeks.  [R270].  She stated that he enjoyed playing sports like basketball and bowling and went to the mall, to movies, to the community center, and to a neighbor's house to play computer games.  [R271].

She acknowledged that Plaintiff is easy to get along with and respectful but stated that he "does not easily make his needs known or communicate his concerns." [R272].  She noted that Plaintiff "often mimics others and tries to please them" but that "[h]e avoids confrontation and eye contact" and avoids authority figures. [R272-73].  She indicated that he would attempt most tasks successfully but struggled with fine motor skills and detailed, multi-step instructions.  [R272].  She stated that he would internalize stress with few outward signs and might just simply walk away without explaining his frustration or refuse to engage.  [R273].  She reported that Plaintiff was "pretty flexible and adapts well to changes" but that it

15

was difficult to determine when Plaintiff had difficulties because he "may appear shy, withdrawn, or odd" and lacks "obvious behavior issues." [R273-74].

In a function report dated February 21, 2017, Plaintiff stated, "My ability to work is fine and [I] don't have any illness, injuries, [etc.]." [R285]. He reported that he helped take care of pets, had no problems with personal care, and could prepare complete meals, take out the trash, clean his room, clean bathrooms, leave the house daily, and shop. [R286-88]. He indicated that he played basketball and hung out with his friends often. [R289]. He reported that he could follow written and spoken instructions, pay attention for long periods of time, and handle stress, and that he got along with authority figures. [R290-91].

In a disability report dated April 17, 2017, Plaintiff's mother requested reconsideration of the denial of benefits. [R297]. She stated that Plaintiff struggled with multiple-step instructions; that based on his education, any employment he might find would be at minimum salary; and that his academic restrictions "will continue to be his greatest challenge." [R297]. She stated that should Plaintiff have children "it would be near impossible for him to support them due to his salary range limitations" and argued that he should not be denied benefits because his deceased father worked hard to provide for him and she could not afford to provide sufficient support on her own. [R297].

16

### D. Medical and School Records

Plaintiff underwent a psychological evaluation in November 2007 and January 2008, when he was eight years old and in the third grade. [R358]. It was noted that Plaintiff had been born "drug exposed," removed from his biological parents, and adopted out; was currently failing all subjects; had comprehension problems and poor social skills; and needed supportive services. [R358-59]. He scored below average on intelligence testing and was assessed to be within the "above average" range of autism probability. [R362, 365]. It was also noted that Plaintiff struggled relating to others, did not understand social cues most people take for granted, and was often "bewildered" by rules of social engagement. [R366]. Plaintiff was diagnosed with autistic disorder, anxiety disorder, and reported cocaine exposure in utero. [R368].

On February 11, 2015, when Plaintiff was sixteen years old, a meeting was held to assess the IEP that had been developed for him at Newton High School. [R872-80]. It was noted that Plaintiff's last psychology report was from March 2012 and that it stated he would be given support for autism and specific learning disorder. [R874]. At the time of the IEP assessment, Plaintiff was repeating the ninth grade, had failed all three end-of-course tests he took, and "did not master any of his goals or objectives for math, reading, [or] writing." [R874].

17

On March 30, 2015, Gary Santavicca, Ph. D., performed a psychological evaluation, including evaluation of Plaintiff's cognitive, academic, behavioral, and emotional functioning.   [R882-94].   Plaintiff's mother described Plaintiff as disciplined, respectful, and kind and was concerned that Plaintiff lacked motivation toward tasks.  [R883].  Notes indicate that Plaintiff's teachers also found Plaintiff to be "always respectful and polite," that he generally formed relationships with peers, and that he got along with others "at an average rate."  [R883-84].  It was also noted that one of Plaintiff's teachers opined that Plaintiff's low academic functioning was due primarily to his lack of motivation, not any mental impairments or deficits.  [R884].

As part of his evaluation, Dr. Santavicca administered the Wechsler Intelligence Scale for Children ("WISC-IV").  [R885].  Plaintiff's scores included a verbal-comprehension score of 75, a working-memory score of 65, and a full-scale IQ score of 61.  [R885].  Dr. Santavicca deemed the results to be valid and opined that if tested again, there was a ninety-five percent chance that Plaintiff's full-scale IQ score would fall between 57 and 67.   [R891].  Dr. Santavicca also observed that although Plaintiff related well to him during the examination, "spontaneous engagement in reciprocal conversation with the examiner was limited to 4 occurrences during a 3-hour testing session"; "eye

18

contact was poorly used to initiate, sustain, and modulate interactions with the examiner"; and Plaintiff "often appeared timid and looked down as opposed to looking at the examiner."  [R884].

Dr. Santavicca diagnosed "autism spectrum disorder (social pragmatic communication disorder)" and mild mental retardation.  [R893].  With regard to social pragmatic communication disorder, Dr. Santavicca explained that the "deficits result in functional limitations in effective communication, social participation, social relationships, academic achievement, or occupational performance, individually or in combination" and that "[t]he onset of symptoms is in the early developmental period (but deficits may not fully become manifest until social communication demands exceed limited capacities)."  [R892].  It was recommended that Plaintiff be involved in extracurricular and social-group functions whenever possible to ensure that he continued to develop and practice his social skills.  [R893].

On March 16, 2016, Plaintiff underwent a comprehensive vocational evaluation.  [R895-901].  Plaintiff reported that he was easily distracted and that he had dropped out of high school in the tenth grade because there were "too many people" in the classroom and the school did not accommodate him.  [R895].  He presented as polite, cooperative, reserved, and fidgety, and he appeared to put his

best efforts into the testing.  [R900].  Myers-Briggs personality profiling indicated that he was introverted, sensing, feeling, and perceiving.[11]  [R900].  He was assessed as being capable of entry-level work, with the ability to progress to semi-skilled work with a vocational-training program or on-the-job training. [R900].

In August 2016, Plaintiff enrolled in the Roosevelt Warm Springs Vocational Rehabilitation Agency program.  [R907].  It was noted based on Plaintiff's vocational evaluation that he "responds best to simple one step instructions, very clear structure, and routine," that he "may benefit from pictorial story boards to keep track of his scheduled classes," that instructions should be given "in simple, concrete terms and broken down even more if he is not showing understanding," that it was advisable to have Plaintiff "state back what he understands the expectations of an assignment to be," that he would "learn best through hands on demonstration and opportunities to engage in supervised practice of skills being taught," that he would benefit from being given short breaks and changing tasks

---

[11]     The Myers-Briggs test purports to evoke a personality profile by using a person's preferences in the way they use their perception and judgment across four dichotomies: extraversion/introversion, sensing/intuition, thinking/feeling, and judging/perceiving.   The Myers & Briggs Foundation, *MBTI Basics*, https://www.myersbriggs.org/my-mbti-personality-type/mbti-basics/ (last visited 3/23/2021).

frequently, that a visual checklist would help him complete tasks and remain organized, and that he should be given "random praise for achieving a target behavior." [R908].  He was enrolled in classes to help him become "more socially and emotionally grounded" and to "address functional limitations in reading social cues, conversational turn taking, and expressive/receptive language deficits associated with Social Pragmatic Disorder." [R910].

On February 3, 2017, Plaintiff's Certified Rehabilitation Counselor, Amanda Bruckner, noted following a routine progress meeting that Plaintiff admitted to "difficulty reading and understanding directions and needing support for this on the job." [R1124].  Plaintiff's mother and his team noted that he was "more at ease when interacting with others" and that he had " 'come out of his shell.' " [R1124].

On March 24, 2017, state agency psychological consultant Dr. Lindi Meadows, Ph.D., reviewed Plaintiff's record in connection with his initial application for benefits. [R101-11].  She opined that as a result of Plaintiff's mental impairments, he had moderate limitations in the areas of understanding, remembering, and applying information; interacting with others; maintaining adequate concentration, persistence, and pace; and adapting and managing himself. [R105].  More specifically, Dr. Meadows opined that Plaintiff was moderately limited in interacting appropriately with the general public, accepting instructions,

and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. [R109].  Dr. Meadows concluded that Plaintiff might be resistant to receiving constructive criticism from those in authority and should have a nonconfrontational supervisor; that although he would be able to interact with coworkers and supervisors on a simple superficial level, he would experience difficulty with interaction on a sustained and in-depth basis; that while he socialized some, he might become anxious, withdrawn, or moody around others and would function better in an environment with minimal social contact with intermittent supervision. [R109].  She additionally opined that incidental contact with the public and co-workers would be fine but that Plaintiff would work best in a relatively isolated workstation for most of the workday and workweek.  [R109].

Ms. Bruckner's notes indicate that on March 29, 2017, Plaintiff had been absent from work due to a pain in his leg and that he had failed to understand that he was expected to report to work unless he received permission from staff to be absent.  [R1125].

At another evaluation in April 2017, Ms. Bruckner noted that Plaintiff was "displaying more disciplinary worthy behaviors."  [R1126].  This was attributed to a desire to return home.  [R1126].  Later that month, Ms. Bruckner noted that

Plaintiff's mother theorized that Plaintiff was having difficulty adjusting to the adoption of another child and to "not being the baby of the family." [R1127]. She reported that Plaintiff was " 'acting out' his emotional insecurity about the changes by sleeping in the new nursery instead of sleeping in his own room." [R1127].

On May 19, 2017, state agency reviewer Shelby Gennett, Ph. D., reviewed the record. [R113-21]. Dr. Gennett endorsed Dr. Meadows's findings without qualification. [R121].

On June 1, 2017, Plaintiff was again examined by Dr. Santavicca for reevaluation of his social pragmatic disorder and assessment of disability. [R1048]. It was noted that although Plaintiff had been unsuccessful at completing his GED, he was able to earn a driver's license and was attending the vocational rehabilitation program at Warm Springs, where he had "blossomed" and was learning basic auto-mechanic skills. [R1049]. Dr. Santavicca noted that Plaintiff presented as nervous, though responsive, agreeable, and easy to communicate with. [R1049]. He was not often distracted and was "responsive to redirection." [R1049]. He made slightly vigilant but appropriate eye contact, with good social interchange. [R1049]. His responses were simple and short but friendly and easy to understand. [R1049]. On the Gilliam Autism Rating Scale, Third Edition (GARS-3) test, Plaintiff scored in the "very likely" range of autism, and his severity level was

"Level 2 which falls in the range of needing substantial support." [R1050, 1053]. Plaintiff was also diagnosed with mild intellectual disability. [R1053]. Dr. Santavicca recommended that Plaintiff undergo individual therapy "to learn coping skills to manage his behavior, increase adaptive functioning and enhance social skills." [R1053]. It was noted that due to Plaintiff's intellectual disability, he would require "extra help to complete academic requirements, and more time for learning and tests, should he revisit education." [R1053].

### E.   Vocational-Expert Testimony

During the administrative hearing, a vocational expert ("VE") testified to the working ability of a person of Plaintiff's age, education, and experience, who would be limited to simple and repetitive tasks that did not require the performance of production-pace work. [R75-76]. Given these limitations, the VE testified that someone with those characteristics could perform the duties of a grocery bagger, dining room attendant, or marker. [R76].

## V.   ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.   Born [in 1998], the claimant had not attained age 22 as of December 12, 2016, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.     The claimant has not engaged in substantial gainful activity since December 12, 2016, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

     . . .

3.     The claimant has the following severe impairments: neurocognitive/developmental disorder, mild intellectual disability, and autism spectrum disorder (i.e. social pragmatic communication disorder) (20 CFR 404.1520(c) and 416.920(c)).

     . . .

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

     . . .

5.     After consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to perform simple, repetitive tasks provided he is not required to perform production-pace work.

     . . .

6.     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on December 12, 1998, and was 18 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

. . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 12, 2016, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

[R13-28].

The ALJ explained that she assigned "limited weight" to Plaintiff's mother's testimony and statements because she found that they were "not entirely consistent throughout the record" and because they "suggest that [Plaintiff] is fundamentally more limited than the objective medical evidence supports," [R20, 25-26]; that she assigned "some weight" to the recommendations resulting from the November 2007 psychological evaluation, which included notes that Plaintiff required social-skills training, an IEP, support groups for autism and psychotherapy, and attention to his sensory overload, but discounted them because they predated the onset date by nine years and appeared to largely rely on statements made by Plaintiff's mother, [R20]; that although they were issued outside the relevant time

period, she assigned "some weight" to the suggestions from the January 2008 evaluation that Plaintiff might work best with interventions, small groups, and extra time and practice skills for math and reading, [R21]; that she assigned only "some weight" to Dr. Santavicca's opinions because they relied heavily on input from Plaintiff's mother, because Dr. Santavicca indicated that Plaintiff had "done well" in his vocational program, because Plaintiff denied emotional disturbance and difficulty interacting with others, and because Plaintiff was able to establish rapport and interact appropriately with unfamiliar examiners, [R25]; and that she assigned "some weight" to the opinions of the state agency reviewing physicians because they were in a unique position to evaluate Plaintiff due to their access to his entire medical record and their degree of understanding of the disability programs and evidentiary requirements, and their opinions were consistent with and supported by the objective findings set forth in the clinical record and were consistent with the longitudinal evidence of record, [R26].  The ALJ additionally acknowledged that counseling records from 2008 through 2010 "may demonstrate a pattern of social deficits and mental health symptoms that might require some accommodations to successfully perform work and school activities, depending on the complexity of the tasks which the claimant is addressing."  [R21-22].  The ALJ explained, however, that while the evidence indicated that Plaintiff could not perform complex

tasks and had difficulty maintaining pace, it also showed that Plaintiff had no more than mild limitations in social functioning:  the evidence showed that Plaintiff had no difficulty interacting with peers or with unfamiliar examiners, including the ALJ; he was described as respectful and cooperative; he "did well" in the vocational rehabilitation program and had worked in an unstructured environment; he did not report having any problems with constructive criticism; Plaintiff himself stated that he had no illness or injury that would preclude work activity; and the personality traits of shyness and introversion did not warrant a finding that Plaintiff had any social functional limitations.  [R25-26].  The ALJ also noted that she found the determination that Plaintiff "may" be resistant to receiving constructive criticism to be vague.  [R26].  Finally, the ALJ explained that she relied on the VE testimony in finding that Plaintiff was capable of working in representative occupations such as grocery bagger, dining room attendant, and marker.  [R27].

## VI.   CLAIMS OF ERROR

Plaintiff alleges that the ALJ erred by failing to include in the RFC limitations resulting from Plaintiff's autism and social pragmatic communications disorder, including limitations in his ability to interact effectively with others, understand social cues, respond appropriately in a social environment, ask questions to seek clarification, and independently communicate his needs to others.

28

[Doc. 15 at 3-4, 6-23].  In support, he first points to record evidence that supports his claims of social limitation.  [*Id*. at 3-4, 6-12].  Second, he points out that the ALJ considered Plaintiff's mother's testimony that Plaintiff was introverted and did not understand social cues but argues that the ALJ failed to consider her testimony that Plaintiff did not easily make his needs known or communicate his concerns, often mimicked others and tried to please them, avoided confrontation and eye contact, avoided authority figures, and lacked obvious behavioral cues, an example of which was his tendency to withdraw or refuse to engage rather than show outward signs of frustration.  [*Id*. at 12-14 (citing [R14-15, 272, 274])].  Third, he contends that it was improper for the ALJ to assign only "some weight" to the state agency consultants' opinions that Plaintiff has moderate social limitations because the state agency consultants are specialists in the field, they were the only medical professionals to offer a function-by-function opinion of Plaintiff's work-related limitations in connection with his claim, discounting the opinions was contrary to the ALJ's finding that the opinions were consistent with the longitudinal evidence of record, the opinions were in fact consistent with the treatment records and third-party observations appearing the record, and in rejecting the opinions, the ALJ impermissibly substituted her own lay opinion for that of the experts. [Doc. 15 at 14-16 & n.5 (citing [R26])].  Fourth, Plaintiff argues that the ALJ's

focus on Plaintiff's respectful and cooperative demeanor, his interactions with his friends, and his demeanor in one-on-one interactions with interviewers is misplaced because there is no allegation that his condition causes him to be disrespectful or intentionally uncooperative but rather that the condition limits Plaintiff's ability to seek clarification or assistance when needed, or otherwise communicate effectively for purposes of understanding his work responsibilities and completing them. [*Id*. at 13, 16-17 (citing [R15, 17])].  Finally, Plaintiff argues that the ALJ erred by ignoring that the only success Plaintiff had in attempts to work was in a supported work environment.  [*Id*. at 17-23].

## VII.   <u>ANALYSIS</u>

After careful consideration of the arguments, ALJ's decision, and the evidence of record, the Court finds no reversible error.

### A.   **Social Limitations**

To Plaintiff's first point, there certainly is record evidence that would have supported inclusion of social limitations in the RFC.  However, the standard for the Court is not whether the evidence in the record could support Plaintiff's interpretation of the facts or even the Court's interpretation, but instead, whether, following application of the proper legal standards, substantial evidence supports the *Commissioner's* findings.  *See supra* Part III.  Thus, the fact that the record

contains evidence supportive of a finding that Plaintiff had social deficits associated with his conditions does not in and of itself supply grounds for reversal.

This is true even through the evidence includes a showing that social pragmatic communication disorder—one of Plaintiff's severe impairments—is, by definition, a communication disorder.  [Doc. 15 at 3-4 (citing Am. Psych. Ass'n, *Soc. (Pragmatic) Comm'n Disorder*, *see supra* note 9)].  The mere diagnosis of a condition does not establish that Plaintiff experienced all of the potential symptoms of the condition, nor does it say anything about the severity of the condition.  *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) (explaining that the "mere existence" of an impairment does not reveal the extent to which it limits the ability to work); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis [of a condition], of course, says nothing about the severity of the condition."); *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").  Additionally, although the ALJ found at step two of the disability analysis that Plaintiff's social pragmatic communication disorder is "severe," this does not necessarily mean that the ALJ found that the condition had any more than a de minimis effect on Plaintiff's ability

31

to work. *See Stratton v. Bowen*, 827 F.2d 1447, 1453 (11th Cir. 1987) (holding that the application of a "severity" threshold at step two that is greater than de minimis is "overly stringent"); *McDaniel v. v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986) (explaining that "[s]tep two is a threshold inquiry . . . [that] allows only claims based on the most trivial impairments to be rejected"). Thus, the fact that Plaintiff has a social pragmatic communication disorder diagnosis and the ALJ found the condition to be "severe" for the purposes of the step-two analysis does not necessarily mean that the condition affects Plaintiff's ability to work.

The Court is also unpersuaded by Plaintiff's argument that the ALJ failed to fully consider Plaintiff's mother's testimony regarding Plaintiff's social limitations. [*See* Doc. 15 at 13-14]. It appears to be true that the ALJ did not specifically note Plaintiff's mother's testimony that he avoided eye contact and avoided authority figures. [*See generally* R10-28]. Be that as it may, there is no rigid requirement that the Commissioner specifically refer to every piece of evidence in the decision, so long as the decision is not a broad rejection which is not enough to enable the court to conclude that the Commissioner considered the claimant's medical condition as a whole. *Moncrief v. Astrue*, 300 Fed. Appx. 879, 881 (11th Cir. Dec. 1, 2008) (citing *Dyer*, 395 F.3d at 1211) (affirming ALJ's decision despite plaintiff's contention that the ALJ had ignored evidence favorable to her);

*see also McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. Jan. 20, 2017) (citing *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (same)). As Plaintiff recognizes, however, the ALJ did consider Plaintiff's mother's testimony that Plaintiff was introverted and did not understand social cues. [Doc. 15 at 13 (citing [R15)]; [*see also* [R19]]. And contrary to Plaintiff's argument, [*see* Doc. 15 at 13], examination of the ALJ's decision reveals that the ALJ also considered Plaintiff's mother's allegations that Plaintiff needed a "supportive employment coach"; did not engage; would walk away from a situation when he did not understand what was being asked of him; did not respond to emergencies in an urgent fashion; did not show emotion; did not perceive problems or likely dangers; sometimes removed himself from situations with others; minimized and avoided disclosing his diagnosis; did not ask necessary questions; would isolate himself; tended to be a "loner"; was easily influenced; made poor decisions; had difficulty making decisions; and mimicked his brother's actions, sentiments, and aspirations. [R15, 19-22]. The ALJ also noted that Plaintiff had difficulty establishing a rapport with the evaluator who assessed him at age eight, [R20]; that it was recommended when Plaintiff was in elementary school that he might work best in small groups, [R21]; that Plaintiff sought counseling from approximately 2008 to 2010 to address social deficits, which might demonstrate a

33

pattern of social deficits, [R21-22]; that Plaintiff testified that he would occasionally become uncomfortable and leave a situation involving more than six or seven people, [R15], that he had experienced difficulty with a supervisor, [R18-19], and that he felt like an outcast, [R19]; that Dr. Santavicca observed during one evaluation that Plaintiff was shy, quiet, and emotionally withdrawn, displayed poor eye contact, and minimally engaged in spontaneous reciprocal conversation, [R22]; that Plaintiff's mother completed a Social Responsiveness Scale indicating that Plaintiff had significant social skills deficits, [R23]; that a DSM-V severity evaluation suggested that Plaintiff's suspected autism level indicated a need for "substantial support," [R24]; that at the second evaluation, Dr. Santavicca recommended individual therapy to learn coping skills and improve social skills, [R24]; and that the state agency reviewing physicians opined that Plaintiff had moderate limitations in social functioning, [R26].  Thus, while it appears to be true that the ALJ did not specifically note Plaintiff's mother's testimony that Plaintiff avoided eye contact and avoided authority figures, the above references are sufficient indication that the ALJ considered Plaintiff's mother's testimony and Plaintiff's condition as a whole.[12]  Additionally, the ALJ

---

[12]     The Court also notes that even if it did remand the case, it is unlikely that Plaintiff's mother's reports that Plaintiff avoided eye contact and authority

explained that she discounted Plaintiff's mother's statements in part because they were not entirely consistent throughout the record, [R20], highlighting in particular a letter in which Plaintiff's mother lamented that due to his academic restrictions, lack of a high-school diploma, and difficulty with pace and multi-stepped instructions, he would be unable to work at a job that would supply sufficient salary for him to support a family, [R18]. The ALJ accommodated these concerns by limiting the RFC to simple, repetitive tasks that would not need to be performed at a production pace. [R17]. The Court therefore finds no reversible error in the ALJ's consideration of Plaintiff's mother's testimony.

The undersigned also finds no reversible error in the ALJ's consideration of the reviewing opinions. [*See* Doc. 15 at 14-16 & n.5 (citing [R26])]. The opinion of a non-examining reviewing physician is not entitled to deference. *See Walker v. Comm'r Soc. Sec. Admin.*, 835 Fed. Appx. 538, 543 (11th Cir. Dec. 1, 2020) (explaining that the opinion of a non-treating physician is not entitled to deference); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (same). Instead, an ALJ must consider factors bolstering or cutting against the opinion, including whether

---

figures would cause the ALJ to amend the RFC, given Plaintiff's report that he got along with authority figures, [R291], and Dr. Santavicca's observation that following the Warm Springs program, Plaintiff made appropriate eye contact, [R1049].

the source presents relevant evidence to support an opinion and how consistent the medical opinion is with the record as a whole.   20 C.F.R. §§ 404.1527(d), 416.927(d).   An ALJ "may reject any medical opinion if the evidence supports a contrary finding." *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987).

It first bears remark that Plaintiff's representations pertaining to the reviewing physicians' findings are somewhat inaccurate.   While the ALJ did state that she assigned some weight to the opinions because she found them consistent with the objective findings and longitudinal evidence of record, she immediately went on to caveat that finding with an explanation that "the evidence in its entirety" did not support the reviewers' conclusion that Plaintiff had moderate limitations in social functioning.   [R26].   Thus, the ALJ did not neglect to reconcile her social-limitations finding with her finding that the reviewing opinions were otherwise consistent with the objective findings and the longitudinal evidence of record.   It is also notable that the reviewers found that Plaintiff was not as limited as his mother asserted, as they opined that Plaintiff was not significantly limited in his ability to ask simple questions, request assistance, or maintain socially appropriate behavior.   [R108-09].   The Court also finds it significant that the reviewing opinions were equivocal regarding the social limitations necessary for Plaintiff to sustain work:   the reviewing physicians opined not that Plaintiff

required minimal contact with others but instead that Plaintiff "may" be resistant to receiving criticism from supervisors, "would function better" in an environment with minimal social contact with intermittent supervision, and "would work best" in a relatively isolated work station for most of the workday and workweek.  [R109]. "Where a . . . physician expresses uncertainty as to his own medical findings, the ALJ has no obligation to defer to his opinion."  *Mason v. Comm'r of Soc. Sec.*, 430 Fed. Appx. 830, 832 (11th Cir. June 16, 2011) (per curiam) (citing *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991)); *see also Putman v. Soc. Sec. Admin., Comm'r*, 705 Fed. Appx. 929 933, n.1 (11th Cir. Sept. 18, 2017) (finding that the ALJ did not err in assigning less than great weight to an opinion that "was 'equivocal at best' ").   Additionally, the ALJ recognized that the reviewing physicians were experts in their fields with access to the longitudinal record, but she also cited multiple records in support of her decision to discount their opinions relating to Plaintiff's social limitations:   not only the ALJ's own finding that Plaintiff was respectful and cooperative, other examiners' findings that he was respectful and cooperative, and records showing that he could get along with people he already knew, but also teachers' reports that Plaintiff had no difficulty forming relationships with peers and got along with others at an average rate; notes from the Warm Springs program indicating that Plaintiff regularly played basketball

with friends he made there and otherwise maintained his well-being in the residential-living situation; Dr. Santavicca's finding that Plaintiff "blossomed" at the Warm Springs program, had "good social interchange," and made appropriate eye contact; and Plaintiff's own statements that he would rather be with others than alone, that he did not have trouble interacting with others, that his difficulty with pace kept him from succeeding in his work at Value Village, and that his ability to work was fine.  [R13-15, 21-22, 24-25].

Plaintiff is also incorrect that the ALJ's partial reliance on her own observations of Plaintiff's demeanor was improper "sit and squirm" jurisprudence, which "occurs when an ALJ who is not a medical expert subjectively arrives at an index of traits which he expects the claimant to manifest at the hearing and denies the claim if the claimant does not exhibit them."  *Wood v. Soc. Sec. Admin., Comm'r.*, 726 Fed. Appx. 742, 745 (11th Cir. Mar. 12, 2018) (punctuation omitted) (citing *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1984)).  Rather, the ALJ noted that Plaintiff's respectful and cooperative demeanor contradicted allegations that Plaintiff was significantly limited in his ability to interact with strangers and authority figures. [*See* R26].  Thus, the ALJ did not ignore medical evidence and impose her own subjective standards but instead appropriately considered

Plaintiff's demeanor at the hearing as one of many factors that called the allegations of social limitations into question.

Nor was the ALJ required to credit the social limitations appearing in the mental RFC forms completed by the reviewing physicians, as the opinion of a reviewing physician is not entitled to great weight, and the lack of social limitations is supported by the findings of Dr. Santavicca, who examined Plaintiff twice and found at the second examination that Plaintiff had "blossomed" at the Warm Springs program, had "good social interchange," and made appropriate eye contact; the ALJ's finding that Plaintiff was respectful and cooperative; other examiners' findings that he was respectful and cooperative; teachers' reports that Plaintiff had no difficulty forming relationships with peers and got along with others at an average rate; notes from the Warm Springs program indicating that Plaintiff regularly played basketball with friends he made there and otherwise maintained his well-being in the residential-living situation; and Plaintiff's own statements that he would rather be with others than alone, that he did not have trouble interacting with others, that his difficulty with pace kept him from succeeding in his work at Value Village, and that his ability to work was fine.  [R13-15, 21-22, 24-25].  The Court therefore finds that the ALJ supplied substantial evidence for discounting the reviewers' social limitations and limiting Plaintiff to simple, repetitive tasks and

no production-paced work. *See Ybarra v. Comm'r of Soc. Sec.*, 658 Fed. Appx. 538, 543 (11th Cir. Sept. 29, 2016) (affirming the ALJ's decision to discount a treating physician's opinion, since the ALJ weighed the credibility of the opinion in light of other record evidence, including medical opinions); *Miles v. Comm'r of Soc. Sec.*, 652 Fed. Appx. 923, 927-28 (11th Cir. June 21, 2016) (affirming the ALJ's decision to discount the opinion of a consulting physician, as reasons given were consistent with treating physician's opinion); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (affirming the ALJ's decision to discount a consulting psychologist's opinion because it was not entitled to great weight and other evidence supported the ALJ's findings).

### B.   Work Record

The Court also is not persuaded that the ALJ erred by inferring that Plaintiff could work at a full-time job or discounting allegations of limitation based on Plaintiff's success in the Warm Springs vocational program and his work at Value Village. [Doc. 15 at 17-23]. Plaintiff has not pointed to any portion of the decision where the ALJ inferred based on Plaintiff's prior work that he was capable of working a full-time job, and the Court finds none. Instead, the ALJ considered the work as evidence informing the RFC analysis. [*See generally* R10-28]. "An ALJ may properly consider work done during a period of alleged disability, even if the

work is less than substantial gainful activity," so long as that the ALJ also considers the structure of the job and any difficulties the claimant had maintaining the work. *Sonya E. v. Saul*, 446 F. Supp. 3d 1287, 1299-1300 (N.D. Ga. 2020) (Totenberg, J.) (citing 20 C.F.R. § 404.1571).

Plaintiff argues that it was improper for the ALJ to discount allegations of limitation based on Plaintiff's prior employment because Plaintiff was fired from his job at Value Village after only six weeks and the ALJ failed to acknowledge that the Warm Springs program—Plaintiff's only successful attempt at work—was part-time work undertaken in a supportive setting.  [Doc. 15 at 19-23].  However, the ALJ recognized that Warm Springs was a vocational rehabilitation program, where Plaintiff received help, required extra time to learn new tasks and some repetition of instructions, was involved in smaller group settings, had a supportive coach to assist him, and learned living skills, [R14-15, 17-20, 23]; that when Plaintiff was able to secure work in an unstructured environment, he did so only for a short time before he was fired due to failure to complete his assignments, [R15, 19, 23]; that a vocational evaluation suggested that Plaintiff needed very simple information, [R23]; and that Plaintiff "has not received offers of sustainable employment," [R15].  It therefore appears, contrary to Plaintiff's argument, that in

formulating the RFC, the ALJ considered the both the favorable and unfavorable aspects of Plaintiff's prior attempts at employment.

### C. Summary

For the reasons set forth above, the Court concludes that Plaintiff has not shown that the ALJ neglected to consider evidence favorable to his claim or failed to point to substantial evidence to support her decision. Accordingly, given the Court's limited scope of review, the ALJ's decision is hereby **AFFIRMED**.

## VIII. CONCLUSION

In conclusion, the Court **AFFIRMS** the final decision of the Commissioner.

The Clerk is **DIRECTED** to enter final judgment in favor of the Commissioner.

**IT IS SO ORDERED and DIRECTED**, this 23rd day of March, 2021.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

42